**Daniel LARSEN, Petitioner,**

v.

**Derral G. ADAMS, Warden, Respondent.**

No. CV 08–04610 CAS (SS).

United States District Court, C.D. California.

June 14, 2010.

Alexander James Simpson, Jan Stiglitz, Justin Brooks, California Western Law School, San Diego, CA, for Petitioner.

Eric J. Kohm, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondent.

**ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE**

CHRISTINA A. SNYDER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the First Amended Petition, all of the records and files herein, the Magistrate Judge's Report and Recommendation, Respondent's Objections ("Objections") and Petitioner's Response to Respondent's Objections. After having made a *de novo* determination of the portions of the Report and Recommendation

to which Objections were directed, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge. However, the Court addresses Respondent's Objections below.

Respondent objects that the Magistrate Judge's April 27, 2010 Report and Recommendation ("April 27 R & R") relied on hearsay, specifically "the untested declarations of Petitioner, Jorji Owen, and William Hewitt." (*See* Objections at 2). Regarding the declarations of Owen and Hewitt, Respondent complains that (1) "the [April 27] R & R recites the contents of Owen's and Hewitt's declaration[s]"; and (2) "in finding the prejudice prong of ineffective assistance of counsel to have been met, the [April 27] R & R relied on the Magistrate Judge's previous July 13, 2009 Report and Recommendation ["July 13 R & R"]," which "was clearly based in part on the declarations." (*Id.* at 2–3). This objection has no merit.

First, it is clear that both the April 27 R & R and the July 13 R & R rely on the testimony of the live witnesses, not the Owen and Hewitt declarations. The April 27 R & R merely recite the contents of the Owen and Hewitt declarations. (April 27 R & R at 21–22). It does not rely on the declarations in any material way. The April 27 R & R relies on the July 13 R & R to the extent that the July 13 R & R finds that Petitioner met the "actual innocence" standard announced in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and therefore had established the prejudice prong of the ineffective assistance of counsel analysis under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (*See* April 27 R & R at 43–44). In the section of the July 13 R & R referred to in the April 27 R & R, it is clear that the Magistrate Judge relied on the testimony of the live witnesses. (*See* July 13 R & R at 34–42). The July 13 R & R mentions the contents of the Owen and Hewitt declarations in only two sentences in the eight-page section (*see id.* at 36, 40), and those two sentences are merely peripheral to the Magistrate Judge's findings. Second, the objection to the Owen and Hewitt declarations presented in the current Objections is almost identical to argument Respondent presented, and the Court rejected, in his Objections to the July 13 R & R. (*See* Objections to [July 13] Report and Recommendation of United States Magistrate Judge ("Objections to July 13 R & R") at 1–6; *see also* Order Adopting Findings, Conclusions and Recommendations of United States Magistrate Judge ("Order Adopting July 13 R & R") at 1 (adopting July 13 R & R and noting that the Court reviewed Respondent's Objections and made "a *de novo* determination of the portions of the [July 13 R & R] to which Objections were directed")).

Regarding Petitioner's declaration, Respondent objects that the April 27 R & R relied on it "in support of [ the] finding that a motion for new trial may have been granted on the basis of the discovery of new evidence." (Objections at 3). However, a review of the relevant paragraph in the April 27 R & R reveals that this is merely an alternative finding: "to the extent that counsel's lack of diligence would have rendered a new trial motion futile, thereby undermining prejudice from counsel's failure to make the motion, Petitioner's argument for prejudice based on counsel's failure to investigate is strengthened." (April 27 R & R at 51). Thus, the finding of prejudice would stand even without reliance on Petitioner's declaration.[1]

---

1. In objecting to Petitioner's declaration on hearsay grounds, Respondent fails to consider Federal Rule of Evidence 807, the "residual exception" to the hearsay rule, which allows reliance on certain hearsay evidence not excepted from the prohibition on hearsay by the

Petitioner's remaining objections are similarly meritless. The Court already considered and rejected Respondent's relevance objection to the testimony of Brian McCracken. (*See* Objections at 8 (objecting to McCracken testimony as irrelevant); Objections to July 13 R & R at 6–8 (same); Order Adopting July 13 R & R at 1). Petitioner's objection to the admission of attorney Consiglio's disciplinary records also fails for the reasons set out in the April 27 R & R. (*See* April 27 R & R at 56–57 & n. 21).

Finally, the objection that the Magistrate Judge "failed to assess properly the likely impact of the new evidence on reasonable jurors" (Objections at 8), is belied by the record. The July 13 R & R clearly states that, given the evidence " 'it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict.' " (July 13 R & R at 36) (quoting *Schlup*, 513 U.S. at 331, 115 S.Ct. 851); *see also* July 13 R & R at 42 ("This appears to be one of the *extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." (internal quotation marks omitted)). The April 27 R & R makes a similar finding. (*See* April 27 R & R at 44–45). To the extent that Respondent merely *disagrees* with that finding, the Court has already considered and rejected such objections. (*See* Objections to July 13 R & R at 8–11; Order Adopting July 13 R & R at 1).

IT IS ORDERED THAT:

1. The First Amended Petition is GRANTED in its entirety.

2. The action is remanded for a new trial within ninety (90) days of this decision, plus any additional delay authorized under state law. If the State elects not to pursue a retrial, Petitioner shall be released from custody within ninety (90) days of the date the Judgment herein becomes final. Respondent shall either release Petitioner from custody or retry him within ninety days of the date of this Order.

3. The Clerk shall serve copies of this Order and the Judgment herein by United States mail on counsel for Petitioner and counsel for Respondent.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SUZANNE H. SEGAL, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Christina A. Snyder, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

### I.

### INTRODUCTION

On July 15, 2008, Daniel Larsen ("Petitioner"), a California state prisoner represented by counsel, filed a Petition for Writ

enumerated exceptions of Federal Rules of Evidence 803 and 804. *See* Fed.R.Evid. 807. It requires a court to determine that (1) the out-of-court statement has "circumstantial guarantees of trustworthiness"; (2) the statement is "offered as evidence of a material fact"; (3) the statement is "more probative on the point for which it is offered than any other evidence which the proponent can pro-

cure through reasonable efforts"; and (4) admission of the statement will serve the purposes of the evidentiary rules and the interests of justice. (*Id.*). The statement objected to here—that Petitioner did not discover the names of two exculpatory witnesses until after the trial but before sentencing—would likely fall into this exception.

of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. The Court dismissed the Petition with leave to amend on August 7, 2008. Petitioner filed the operative First Amended Petition ("FAP") on October 27, 2008, along with a Memorandum of Points and Authorities ("FAP Memo"). In the First Amended Petition, Petitioner's sole ground for relief is that his June 23, 1999 conviction was obtained unconstitutionally because his trial counsel provided ineffective assistance. (FAP at 5). Specifically, Petitioner claims that his trial counsel failed to locate, investigate, and bring to trial exculpatory witnesses and failed to present evidence of third-party culpability. (Id.).

Respondent filed a Motion to Dismiss on January 16, 2009, asserting that the First Amended Petition is untimely. In addition, Respondent lodged several documents.[1] Petitioner filed an Opposition on February 19, 2009. In the Opposition, Petitioner argued that by making a "colorable showing of factual innocence," he should be allowed to present his otherwise time-barred constitutional claim to the Court. (Opposition at 3). On May 19, 2009, the Court held a hearing to evaluate Petitioner's evidence of actual innocence ("First Evidentiary Hearing" or "1EH"). The Court found that Petitioner had presented sufficient evidence to satisfy the "actual innocence" gateway set forth in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The Court further found that, as a matter of law, Petitioner's successful Schlup showing excused his failure to comply with the federal stat-

ute of limitations and allowed the Court to consider the merits of the First Amended Petition. On August 7, 2009, 642 F.Supp.2d 1124 (C.D.Cal.2009), the District Court adopted this Court's findings, conclusions and recommendations, denied the Motion to Dismiss and ordered this Court to conduct further proceedings regarding Petitioner's constitutional claims.

On September 28, 2009, Respondent filed his Answer to the First Amended Petition. Petitioner filed a Traverse on October 13, 2009. On November 17, 2009, the Court held another evidentiary hearing to consider Petitioner's evidence that his trial counsel rendered ineffective assistance ("Second Evidentiary Hearing" or "2EH"). Petitioner and Respondent filed post-evidentiary hearing briefs (respectively, "P.'s PEH Br." and "R.'s PEH Br.") on December 15, 2009.

This matter is now ready for decision. For the reasons discussed below, the Court finds that Petitioner's ineffective assistance of counsel claim is meritorious. Therefore, it is recommended that the First Amended Petition be GRANTED.

## II.

## PRIOR PROCEEDINGS

Petitioner was charged with possession of a dagger, in violation of California Penal Code ("Penal Code") section 12020(a). (CT 34). The prosecution chose to charge this violation as a felony.[2] (Id.). Petitioner pled not guilty. (CT 37). On June 23, 1999, a Los Angeles County Superior

---

1. Respondent's lodged documents include the Clerk's Transcript ("CT") and the two-volume Reporter's Transcript ("RT"). All references to "Lodgment 1" through "Lodgment 8" refer to the other documents lodged by Respondent with his Answer.

2. Possession of a dagger can be charged either as a misdemeanor or as a felony. See

Cal.Penal Code § 12020(a) ("Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison."); See also People v. Plumlee, 166 Cal. App.4th 935, 938, 83 Cal.Rptr.3d 172 (2008) (recognizing that possession of a dagger is a "wobbler," i.e., it may be charged as a misdemeanor or a felony).

Court jury found Petitioner guilty. (CT 92). Petitioner admitted to three prior felony convictions.[3] (CT 88). As a result of Petitioner's prior convictions, the trial court sentenced Petitioner under California's Three Strikes Law, Cal.Penal Code §§ 667(b)-(i), 667.5(b), 1170.12(a)-(d), to twenty-eight years to life imprisonment. (CT 91).

Petitioner appealed his conviction. On June 1, 2000, the California Court of Appeal affirmed the trial court's judgment. (Lodgment 2). The California Supreme Court denied review on August 9, 2000. (*See* Lodgment 3). Petitioner did not raise his ineffective assistance of counsel claim on direct appeal.[4] (*See* FAP at 2–3).

On May 18, 2005, Petitioner raised his ineffective assistance of counsel claim for the first time when he filed a state habeas petition in the Los Angeles County Superior Court.[5] (Lodgment 4). The superior court denied this petition on May 19, 2005, holding that there was "insufficient evidence alleged that trial counsel failed to act in a manner of a reasonably competent

attorney." (Lodgment 6, Exh. N). Petitioner then filed a habeas petition in the California Court of Appeal on February 27, 2006. (Lodgment 5). The court of appeal denied the petition on March 28, 2006. (Lodgment 6, Exh. M). Petitioner applied for habeas relief in the California Supreme Court on May 31, 2006. (*See* Lodgment 7 at 2). Pursuant to a request by the state supreme court, Respondent filed an informal response to the petition (Lodgment 7), and Petitioner filed an informal reply.[6] (Lodgment 8). The supreme court denied the petition without comment on July 25, 2007. (FAP, Exh. Q). Petitioner filed the instant federal Petition on July 15, 2008.

## III.

## FACTUAL BACKGROUND

### A. *Evidence Presented At Petitioner's Trial*

Petitioner did not present a defense at trial. (2 RT 262). The prosecution called three witnesses. Police officers Thomas Townsend and Michael Rex were perci-

---

3. Petitioner was convicted in 1987 and 1989 of burglary, in violation of Penal Code section 459, and in 1993 of possession of a deadly weapon, in violation of Penal Code section 12020(a). (*See* CT 35, 88).

4. On direct appeal to both the California Court of Appeal and the California Supreme Court, Petitioner raised three claims: (1) "The trial court erred in excluding evidence, relevant to the credibility of officer Townsend, that the original case against [Petitioner] had been dismissed because no evidence was presented that the alleged dagger was concealed"; (2) "The trial court erred in admitting evidence that [Petitioner] gave a false name on arrest and instructing that such evidence could be construed as consciousness of guilt"; and (3) "[Petitioner's] punishment is so grossly disproportionate to the conduct for which it is imposed that it shocks the conscience and offends fundamental notions of human dignity." (FAP at 2–3).

5. In his 2005 petition to the superior court, Petitioner argued that his trial counsel was deficient for failing to investigate and call several potentially exculpatory witnesses. (*See* FAP, Exh. T at 276–78). Petitioner also argued that his trial counsel provided ineffective assistance when he failed to request that the dagger be fingerprinted and when he failed to raise a defense of third-party culpability. (*See id.* at 278–80).

6. A California court may respond to a habeas petition in one of three ways. If, taking the petitioner's allegations as true, the petitioner makes a prima facie showing that he is entitled to relief, the court issues an order for the respondent to show cause why relief should not be granted. The court may also deny the petition. Alternatively, the court may request an informal response from the respondent, the real party in interest, or an interested person. The petitioner may file a reply to the informal response. *See* Cal. R. Ct. 4.551, 8.385.

pient witnesses to the events leading up to Petitioner's arrest. Detective Kenneth Crocker testified about events after Petitioner was booked at the police station.

### 1. Officer Thomas Townsend's Testimony

Thomas Townsend is a Los Angeles Police Department officer. (1 RT 36). Around 1:00 a.m. on June 6, 1998, he received a call pertaining to the Gold Apple bar. (1 RT 36–37). His partner at the time was Mike Rex. (*Id.*). The call reported an assault with a deadly weapon in progress, with shots fired. (1 RT 37). The call described the suspect, who reportedly had a gun, as wearing a green flannel shirt and having a long ponytail. (*Id.*). In court, Townsend identified Petitioner as the man wearing a green flannel shirt that night.[7] (1 RT 46). Townsend testified that he was driving the car and that because the call was "Code Three," he had on his flashing lights and siren. (1 RT 38). As Townsend approached the scene, he turned off his lights and siren so as not to alert people of his arrival. (1 RT 39).

When Townsend arrived at the scene, business signs and overhead lights lit the bar's parking lot. (1 RT 41). Townsend then turned on his car's roof-mounted floodlights, as well as the car's side spotlights and high beams. (*Id.*). Townsend could not remember if there was enough light to see Petitioner before he turned on his car's lights. (*Id.*).

Townsend saw Petitioner standing in the parking lot, facing the police car. (1 RT 42). A chain-link fence separated Petitioner from Townsend. (*See* 1 RT 54; 1EH, Exh. 105). Townsend was approximately twenty-two feet away from Petitioner. (1 RT 82–83). Townsend testified that he could see Petitioner's entire body, but he focused on Petitioner's hands, looking for a weapon. (1 RT 43–44). Because Townsend thought that Petitioner might have a weapon, he had "tunnel vision" on Petitioner. (1 RT 44). Townsend testified that "to distract [his] tunnel vision [he] still attempted to look around the area." (*Id.*).

While Townsend was still in the police car, he saw Petitioner crouch down, reach into the waistband of his pants and pull out an object. (1 RT 48, 50). Townsend described this object as "linear.... Possibly five or six inches long." (1 RT 51). However, Townsend admitted that he "couldn't tell what it was that he was grasping." (1 RT 49–50). After pulling this object out of his pants, Townsend testified that Petitioner threw it underneath a car to his left. (1 RT 50). Petitioner was facing Townsend as he threw the object, and Townsend could see both the entire throwing motion and the area where the object landed. (1 RT 52). As Petitioner threw the object, he was lit by the parking lot lights and by the lights on Townsend's car. (1 RT 48). At the time, Townsend and Rex were the only police officers at the scene. (1 RT 59). Only later did other police units arrive, including a helicopter with a "Night Sun" spotlight. (1 RT 59–60, 78).

Townsend remembered between ten and twenty people in the parking lot with Petitioner, standing between ten and thirty feet away from Petitioner. (1 RT 53). As Townsend exited the police car, he yelled at everyone to get down on their knees and put their hands on their heads. (1 RT 58). Townsend testified that after this

---

**7.** Officer Townsend admitted that Petitioner did not have a gun. Furthermore, according to Townsend and to Elinore McNutt, a witness who testified at the evidentiary hearing, Petitioner had short hair on the night of his arrest, not a ponytail. (*See* 1 RT 46; 102; First Evidentiary Hearing Transcript ("1EHT") 50). The original description of the suspect stated that he had a "long ponytail." (1 RT 37).

"everybody was detained in handcuffs, most people were." (1 RT 61).

Townsend searched Petitioner. (1 RT 62). He did not find a sheath for a knife on Petitioner. (*Id.*). After putting Petitioner in the back of a police car, Townsend went to look for the object Petitioner had thrown. (1 RT 62–63). Townsend picked up an object from underneath the pickup truck which was "a knife with a double-edged blade. It was a weighted handle and it had a finger guard for your hand." (1 RT 63).

Townsend searched the parking lot for other weapons. (1 RT 75–76). He found a three- to four-inch long copper bar wrapped with cloth tape. (1 RT 64). Townsend found this copper bar ten to thirty feet away from Petitioner in the opposite direction from where Townsend saw Petitioner throw the object. (1 RT 65). Townsend testified that he did not see Petitioner or anyone else throw the copper bar. (1 RT 70). He was sure that the copper bar was not the object he saw Petitioner pull out of his waistband. (1 RT 74).

On cross-examination, Townsend testified that the knife he recovered at the scene was "extremely sharp." (1 RT 92). Townsend took precautions against the knife cutting through the evidence bag by wrapping the blade in tape. (1 RT 91–92). Townsend believed that the blade could easily "poke through skin." (1 RT 92).

Townsend admitted to several inconsistencies between his testimony at trial and at two preliminary hearings. In his arrest report, Townsend did not mention that the knife was concealed. (1 RT 87–88). Similarly, at a preliminary hearing on November 6, 1998, Townsend did not testify that the knife was concealed. (1 RT 88). The initial case against Petitioner was dismissed for insufficient evidence of concealment, an element of the crime with which Petitioner was charged. (*See* FAP at 2;

Second Evidentiary Hearing Transcript ("2EHT") 35; 2EH, Exh. 23 at 82–86); *see also* Cal.Penal Code § 12020(a)(4). After the November 6, 1998 preliminary hearing, the prosecutor spoke with Townsend about the necessity for testimony about concealment. (1 RT 88). Then, at a preliminary hearing on February 23, 1998, Townsend testified for the first time that Petitioner's shirt covered the knife. (1 RT 88–89).

At the November 6, 1998 preliminary hearing, Townsend testified that he was the passenger in the police car, not the driver. (1 RT 81). Townsend made numerous references to being a passenger and observing the scene through the passenger window. (*Id.*). At trial, Townsend attempted to explain this inconsistency. He testified that the passenger of the police car is responsible for the shotgun. (1 RT 141). Although Rex had the shotgun while Townsend picked up the knife, Townsend took the shotgun from him to return it to the police car. (1 RT 142). Townsend explained that because he remembered holding the shotgun at one point, he thought that he had been the passenger. (1 RT 141).

### 2. Officer Michael Rex's Testimony

Michael Rex is also a Los Angeles Police Department officer and was Townsend's partner on June 6, 1998. (1 RT 166–67). Rex testified that the call pertaining to the Gold Apple bar stated that an assault with a deadly weapon was in progress. (1 RT 167). The call listed five males. (*Id.*). Of those five, only one had a particular description, which was a white male wearing a green flannel shirt and armed with a handgun. (*Id.*).

When Rex and Townsend arrived at the scene, Rex could see Petitioner lit by the business signs, the overhead parking lights, and the lights on the police car. (1 RT 170). Rex testified that he focused on

Petitioner because he matched the particular description in the call.[8] (*Id.*). Specifically, he focused on Petitioner's hands and waist area. (*Id.*). There were two other men standing five to ten feet away from Petitioner. (1 RT 171).

On direct examination, Rex testified that as he and Townsend approached in the police car, Petitioner was facing them. (1 RT 173). On cross-examination, Rex testified that Petitioner was first facing away from the police car, then turned his entire body to face the car. (2 RT 209). Petitioner was standing approximately twenty feet away from the police car at the time and nothing obstructed Rex's view of him. (1 RT 177). Rex was the passenger in the police car and saw Petitioner through the passenger side of the windshield. (*Id.*). Two other males were standing with Petitioner. (1 RT 171). Rex thought it was odd that Petitioner was wearing a flannel shirt, because it was a warm night and no one else was wearing warm clothing. (1 RT 194).

As Petitioner faced the police car, Rex testified that he saw Petitioner reach into ·his waistband and pull out a shiny metal object. (1 RT 174). This object was five to six inches long. (1 RT 175). According to Rex, after pulling the object from his waistband, Petitioner crouched down, bent at the knees, and threw the object under the car next to him. (*Id.*). When Rex got out of the car, he was ten feet away from the thrown object. (1 RT 180).

Rex testified that he was focused on covering Townsend with the shotgun and also focused on the object Petitioner had thrown. (1 RT 183). After Petitioner threw the object, no one else came near it.

(1 RT 186). Rex was certain that the object Petitioner threw was not the copper bar Townsend found, because the bar was not as big as the object Rex saw and was not shiny. (1 RT 187).

Rex spoke to Petitioner at the scene. Petitioner said that his name was Anthony Vant. (1 RT 189–90). Rex strip searched Petitioner after taking him to jail. (1 RT 192). During the strip search, Rex did not find a sheath or any other protection for a knife (1 RT 192; 2 RT 217), nor did he find any pull or tear marks on Petitioner's clothes. (2 RT 218).

### 3. Detective Kenneth Crocker's Testimony

Kenneth Crocker is a Los Angeles Police Department detective. (2 RT 233). After Petitioner's arrest, Crocker was in charge of filing the case with the District Attorney's office. (2 RT 233–34). While processing Petitioner's file, Crocker discovered that the fingerprints taken from Petitioner matched those associated with Daniel Larsen rather than Anthony Vant. (*Id.*). Crocker then compared the driver's license photos on file and found that Anthony Vant did not look like Petitioner. (2 RT 236).

Crocker also testified that he never requested an analysis of the fingerprints on the knife. (2 RT 239). Petitioner's trial counsel never requested a fingerprint analysis. (*Id.*). Even if some party had requested an analysis, because the knife "was handled by several different people before it got into evidence," Crocker thought that there would not be "a very good chance of getting any readable fin-

---

8. Again, the Court notes that Petitioner did not exactly match the description of the suspect in the call. According to Townsend, Petitioner was wearing a green flannel shirt. (*See* 1 RT 41, 46). Rex did not testify to the color of Petitioner's shirt, but did state that

the shirt was flannel. (*See, e.g.,* 1 RT 174). Rex testified that the suspect in the call was described as armed with a handgun. (*See* RT 167). However, Townsend confirmed that Petitioner did not have a gun.

gerprints off [the] knife." (2 RT 240). On cross-examination, Crocker admitted that "there are ways to pick up pieces of evidence that you are not going to contaminate it for fingerprints." (2 RT 241).

## B. *The Court's First Evidentiary Hearing*

This Court held the first evidentiary hearing on May 19, 2009. Petitioner was present, represented by Jan Stiglitz, Alexander Simpson, and Alissa Bjerkhoel of the California Innocence Project. Petitioner called three witnesses, who he claims his attorney should have presented during Petitioner's jury trial. In addition, Petitioner presented documentary evidence, that he again claims his attorney should have presented during his original trial. Respondent did not call any witnesses.

### 1. James McNutt's Testimony

James McNutt is currently a correctional officer in Tennessee. (1EHT 16–17). He previously spent twenty-two years in the military, serving in combat in Vietnam and Grenada. (1EHT 14). After leaving the military, Mr. McNutt spent eight years as a police officer in North Carolina, including time as a chief of police. (1EHT 15–16).

On June 6, 1998, Mr. McNutt went to the Gold Apple bar with his wife to celebrate a birthday. (1EHT 17). Mr. McNutt intended to meet his stepson, Daniel Harrison, at the bar. (1EHT 18). Mr. McNutt estimated that he arrived at the bar around 7:30 p.m., but stated that he was unsure of the time. (1EHT 18). Mr. McNutt parked facing the bar. (*Id.*). Harrison was parked behind him and to the right. (*Id.*).

When Mr. McNutt exited his car, he heard a loud argument coming from near Harrison's car. (1EHT 19). Mr. McNutt walked over to Harrison's car and stood by the front driver's side. (1EHT 19–20; *see also* 1EH, Exh. 21). Two other people were standing near Harrison's car: Petitioner and William Hewitt.[9] (1EHT 20–21). Mr. McNutt was standing approximately two feet away from Hewitt. (1EHT 21). Hewitt was standing next to the driver's door of Harrison's car. (*See* 1EH, Exh. 21). Petitioner stood behind Hewitt, closer to Harrison's taillights. (*Id.*). Mr. McNutt, Hewitt, and Petitioner were in these same positions when Mr. McNutt became aware of the police. (1EHT 22).

After Mr. McNutt walked to Harrison's car, he argued with Hewitt for approximately two minutes. (*Id.*). Petitioner did not say anything while Mr. McNutt was there. (1EHT 24). Petitioner stood with his hands at his sides, listening to Mr. McNutt and Hewitt argue. (*Id.*). After arguing with Hewitt for two minutes, Mr. McNutt heard someone yell "5–0." (1EHT 22). Mr. McNutt took this to mean "police." (1EHT 22–23). Mr. McNutt then saw twenty to twenty-five police officers arrive from all directions. (1EHT 23).

Mr. McNutt was paying attention to Hewitt because Hewitt was hostile. (*Id.*). When the police arrived, "[Hewitt] turned around, took a few steps . . . [and] threw an item near the vehicle parked next to [Harrison's] vehicle." (*Id.*). Mr. McNutt did not see the object when it was in Hewitt's hand, but heard it hit the ground. (*Id.*). The object sounded metallic, and Mr. McNutt believes that it was "probably" a knife. (*Id.*). Based on his professional experience, Mr. McNutt testified

---

9. Hewitt went by the name "Bunker" (*see* FAP, Exh. D at 68), which was the name that Mr. McNutt primarily used when referring to him. For consistency, the Court refers to him only as Hewitt.

that the object was not a handgun. (*Id.*). Mr. McNutt also testified that a copper weight would not have made the noise he heard. (1EHT 32). After Hewitt threw the object, Mr. McNutt saw it go under the vehicle. (1EHT 23). It appeared to be ten or twelve inches long. (1EHT 32).

When the police arrived, Mr. McNutt, Petitioner, and Hewitt walked away from Harrison's car, toward the bar. · (1EHT 24; *see also* 1EH, Exh. 21). Mr. McNutt, who was wearing a Pittsburgh Steelers jacket because the night was cool, heard: "You in the fucking Pittsburgh Steelers jacket. . . . Freeze." (1EHT 25). Two police officers handcuffed Mr. McNutt. (*Id.*). One of the police officers frisked Mr. McNutt, and in the process "massaged" Mr. McNutt's penis "for about five, six seconds." (*Id.*). An officer then searched Mr. McNutt's wallet, finding cards identifying Mr. McNutt as a former police officer and chief of police. (*Id.*). The officers then opened Mr. McNutt's handcuffs and told him to leave. (*Id.*). Mr. McNutt asked the officers what they were looking for and was told: "a black man with a gun." (*Id.*). The officers never interviewed Mr. McNutt about what he had seen. (1EHT 25–26). Mr. McNutt never went into the Gold Apple bar that night. (1EHT 30).

Mr. McNutt was not contacted by an attorney about the events of June 6, 1998 until approximately two years later. (1EHT 26). However, had Petitioner's counsel asked, Mr. McNutt would have agreed to testify at Petitioner's trial as to what he saw in the parking lot. (1EHT 27).

On cross-examination, Mr. McNutt testified that although he remembers lights in the parking lot and red and blue flashing lights on the police cars, he did not remember whether the police cars had their spotlights or headlights on. (1EHT 28). Mr. McNutt neither saw nor heard a police helicopter. (1EHT 28–29). Mr. McNutt testified that he was "a nervous wreck" after the incident. (1EHT 34). He felt that the officers he encountered were extremely rude and rough. (*Id.*). However, he thought that the police officers treated his wife appropriately. (1EHT 36). Mr. McNutt never complained to either the Los Angeles Police Department watch commander or the United States Attorney about the officers' conduct. (1EHT 35, 37).

Although Mr. McNutt saw police arrest Petitioner, Mr. McNutt did not tell any of the police officers that he had been a witness. (1EHT 44). The police ordered Mr. McNutt to leave and did not give him a chance to make a statement. (*Id.*). Mr. McNutt did not make a statement concerning his recollection of Petitioner's arrest until two years after the incident. (1EHT 41).

Mr. McNutt made an initial statement with Mrs. McNutt on September 21, 2001, and a declaration of his own on July 21, 2005. (*See* FAP, Exh. B). The testimony in the statement and the declaration was virtually identical to Mr. McNutt's testimony at the evidentiary hearing. Mr. McNutt did not review any of these documents to prepare for his testimony, although he may have talked about the events with his wife. (1EHT 41–42).

### 2. Elinore McNutt's Testimony

Elinore McNutt is married to James McNutt. (1EHT 47). She has had multiple back surgeries and suffers from fibromyalgia. (*Id.*). As a result, Mrs. McNutt has difficulty sitting for extended periods of time. (*Id.*). Mrs. McNutt did not suffer from her current back problems at the time of Petitioner's arrest. (1EHT 73). Her medication does not affect her ability to recall events. (*Id.*). She chose not to

take any pain medication before the hearing so that she could speak clearly. (*Id.*).

Mrs. McNutt testified that she went with Mr. McNutt to the Gold Apple to meet her son on June 6, 1998. (1EHT 47–48). She does not recall the time that they arrived, but remembers that it was dark. (1EHT 48). Mrs. McNutt's car was parked facing the bar. (1EHT 48–49; *see also* 1EH, Exh. 4). Harrison's car was parked facing the other direction, across "a little parking lot." (1 EHT 48–49). As Mrs. McNutt walked toward the bar, she saw two men walk up to Harrison's car. (1EHT 49). One of these men was Hewitt.[10] (*Id.*). Hewitt had come to Mrs. McNutt's house a week before and stayed for approximately five minutes. (*Id.*). At the time, Hewitt was skinny and had medium length dark hair. (*Id.*). The other man approaching Harrison's car was Petitioner, who was "chubby" and had short hair. (1EHT 49–50).

Mrs. McNutt's attention was on Hewitt because the way he walked directly up to Harrison's car door concerned her. (1EHT 50). She pointed out Hewitt's actions to Mr. McNutt. (*Id.*). While Mr. McNutt walked over to Harrison's car, Mrs. McNutt waited by the tailgate of her car. (1EHT 50–51). She could see Petitioner, Hewitt, and Mr. McNutt from where she was standing. (1EHT 51). Petitioner was standing by Harrison's car's taillights, not by the side of the car. (*Id.; see also* 1EH, Exh. 4). Hewitt stood by the driver's side of the car and Mr. McNutt stood in front of the driver's door. (1EHT 54; *see also* 1EH, Exh. 4). Hewitt and Harrison argued, but Petitioner was not involved. (1EHT 51).

When the police arrived, Hewitt turned toward Mrs. McNutt. (1EHT 55). She saw Hewitt reach into his clothing and throw an object under a car. (*Id.*). Mrs.

McNutt testified that she did not know what the object was, but that it was metal and she heard a clank and a "skidding ... noise" when Hewitt threw it. (*Id.*). At this time, Petitioner "just stood there" with his hands at his sides, then turned and walked away. (1EHT 55–56, 64–65). Petitioner had nothing in his hands. (1EHT 56). Mrs. McNutt saw police officers put Petitioner in a car, but did not know that they had arrested Petitioner. (1EHT 57).

Mrs. McNutt did not remember Petitioner's counsel contacting her. (1EHT 58). She stated that she would have been willing to testify at Petitioner's trial if Petitioner's counsel had contacted her. (1 EHT 59).

On cross-examination, Mrs. McNutt testified that although she remembered seeing overhead lighting in the parking lot, she does not remember lights on either the police cars or a helicopter. (1EHT 62–63). She did not hear any sirens before the police arrived. (1EHT 63). As the police arrived, Mrs. McNutt scanned the parking lot, so her eyes were not on Hewitt and Petitioner the entire time. (1EHT 72–73). Mrs. McNutt saw Mr. McNutt "being fondled by a police officer," and an officer grabbed her by the hair. (1EHT 70–71). She never called the Los Angeles Police Department, the United States Attorney's office, or the F.B.I. to complain about her treatment by the police. (1EHT 71). Mrs. McNutt testified that she believes "it doesn't do a lot of good to call LAPD." (*Id.*). After the police left, Mrs. McNutt and her husband went into the bar, but only for a short time because Mr. McNutt was so upset. (1EHT 59–60). Mrs. McNutt talked to Harrison either later that evening or the next day about what had happened. (1EHT 60–62). Before making her July 21, 2005 declaration (*see*

---

**10.** Like her husband, Mrs. McNutt knew Hewitt as "Bunker." (*See* 1EHT 49).

FAP, Exh. C), Mrs. McNutt discussed what had happened with Mr. McNutt. (1EHT 65–66). She did not discuss anything with Harrison, with whom she did not have much contact. (1EHT 66).

Mrs. McNutt admitted that Harrison had been in prison, but she thinks that the police always treated him fairly. (1EHT 71–72). She said that it seemed like Petitioner, Hewitt, and Harrison knew each other at the time of the incident, but she does not know how they were acquainted. (1EHT 71). She does not think that Harrison and Petitioner were friends. (1EHT 64).

### 3. Brian McCracken's Testimony And Declaration

Brian McCracken admitted that he had been convicted of conspiracy to commit a crime in 1990 and of being a felon in possession of a firearm in 1998. (1EHT 75). The Court took judicial notice of his record of convictions. (1EHT 89). McCracken began supervised release in 2001. (1EHT 76). He has held a job making aircraft components since 2001. (Id.). He has not been arrested during his supervised release. (Id.).

On June 6, 1998, McCracken was in the Gold Apple bar. (1EHT 76). He testified that he does not remember exactly what time he arrived there, but thinks it was around dusk. (1EHT 97). McCracken went to the bar alone. (1EHT 76). McCracken knew Petitioner at the time, but they were not close friends. (1EHT 95). McCracken saw Petitioner in the bar, and was sitting fifteen to twenty feet away from him. (1EHT 77).

After McCracken was in the bar for fifteen or twenty minutes, a man approached him and said "you know, I could kill you right now." (1EHT 77–78, 97–98). This man was not Petitioner. (1EHT 78). The man "flashed" a knife at McCracken. (1EHT 77). The knife was double-edged, with a four to five inch long blade and a finger guard. (1EHT 81). Petitioner's counsel introduced a photograph of a knife found in Petitioner's trial counsel's file. (1EHT 81–82; see 1EH, Exh. 22). McCracken testified that the knife depicted in the photo found in Petitioner's trial counsel's file looks like the knife he saw in the Gold Apple bar. (1EHT 82). McCracken never saw Petitioner with a knife. (Id.).

After the man threatened McCracken, McCracken diffused the situation and ordered beer for the two of them. (1EHT 82–83). When McCracken was ordering, the bartender told him that she had called the police. (1EHT 83). McCracken saw police lights outside the bar, but never went out into the parking lot. (Id.).

In his declaration filed December 4, 2009, McCracken stated that he was never contacted by Petitioner's trial counsel to testify at Petitioner's 1999 trial. (McCracken Decl. ¶¶ 3–4). Had he been asked to testify, McCracken would have been available and would have provided the same testimony as in the First Evidentiary Hearing. (Id. ¶ 5).

On cross-examination, McCracken described the man in the bar with the knife as having a medium build and short brown hair. (1EHT 91–92). The man was neither skinny nor "chunky." (1EHT 92). Although McCracken had difficulty remembering the man with the knife, he was certain of his description of the knife itself. (1EHT 93). He focused on the knife because the man threatened to kill him with it. (Id.). McCracken drank two beers on the night of the incident. (1EHT 97). He had one beer before he saw the knife. (Id.).

### 4. Jorji Owen's Declaration

Jorji Owen did not testify at the First Evidentiary Hearing, but submitted a dec-

laration.[11] (*See* FAP, Exh. D). Owen identified Hewitt as her boyfriend. (*Id.*, Exh. D at 1). According to Owen, on June 6, 1998, Hewitt, Petitioner, and two other men went to a bar. (*Id.*). When Hewitt returned from the bar, he told Owen that Petitioner "had been arrested for possession of his (Hewitt's) knife, and that he (Hewitt) has [sic] tossed the knife under a truck when the police arrived at the bar." (*Id.*). Hewitt sold his motorcycle to bail Petitioner out of jail, because he felt responsible for Petitioner being in jail. (FAP, Exh. D at 1–2). Owen stated that Hewitt felt responsible because the knife belonged to him and he had thrown it under a truck when the police arrived. (*Id.*).

### 5. William Hewitt's Declaration

William Hewitt did not testify at the First Evidentiary Hearing. He executed a declaration on January 15, 2001. (FAP, Exh. F). Hewitt stated that he was with Petitioner when Petitioner was arrested. (*Id.*). He further stated: "I know that the knife was not [Petitioner's], because it was mine." (*Id.*).

### C. *The Court's Second Evidentiary Hearing*

As noted above, following the first evidentiary hearing, this Court found that Petitioner had presented sufficient evidence to satisfy the "actual innocence" gateway set forth in *Schlup*. The Court further found that, as a matter of law, Petitioner's successful *Schlup* showing excused his failure to comply with the federal statute of limitations and allowed the Court to consider the ineffective assistance

of counsel claim raised in the First Amended Petition.

This Court held a second evidentiary hearing (the "Second Evidentiary Hearing") on November 17, 2009, to allow the presentation of evidence pertaining to Petitioner's ineffective assistance of counsel claim. Petitioner was present, represented by Jan Stiglitz, Justin Brooks, Alexander Simpson, and Alissa Bjerkhoel of the California Innocence Project. Two witnesses testified on behalf of Petitioner, who also presented documentary evidence. These witnesses were Edward Consiglio, Petitioner's trial attorney, and Yasmin Cader, an expert witness. Respondent called one witness, Deputy District Attorney Natalie Adomian, and presented documentary evidence.

### 1. Edward Consiglio's Testimony

Edward Consiglio started his law practice in the Los Angeles County District Attorney's office, where he worked for thirteen years. (2EHT 7–8). After working at a company for a couple of years, Consiglio entered into private practice where he handled criminal law matters. (2EHT 8).

Consiglio began his representation of Petitioner in December 1998, after the first preliminary hearing.[12] (2EHT 8, 10). Previously, the Los Angeles County Public Defender's office had represented Petitioner. (2EHT 11). When Consiglio took on Petitioner's case, the public defender's office turned over information to Consiglio, including an investigator's report. (*Id.*). The report indicated that two individuals,

---

**11.** On February 24, 1997, Owen pled guilty to forgery of access cards to defraud, Cal.Penal Code § 484f(a), in Los Angeles County Superior Court. (Respondent's Apr. 8, 2009 Pre-Evidentiary Hearing Memorandum at 2). The Court takes judicial notice of this conviction.

**12.** The initial charges against Petitioner were dismissed after the first hearing and later refiled. (*See* 2EHT 35; 2EH, Exh. 23 at 48–55, 82–86).

Thomas Erwin and Christopher Lloyd, were supposed to have been interviewed. (2EHT 11–12; *see also* 2EH, Exh. 23 at 57–59). At the time, only Erwin had been interviewed. (2EHT 12).

Between the time that he was first retained by Petitioner in December 1998 and the time of Petitioner's trial in June 1999, Consiglio did not hire an investigator. (2EHT 13–14). Money played no role in this decision because Consiglio knew that he "could have gotten a court-appointed investigator." (2EHT 14). Consiglio attempted to contact Thomas Erwin himself but was unsuccessful. (2EHT 15–16).

Consiglio contacted Christopher Lloyd. (2EHT 14–15). After "ha[ving] a number of interviews with him," Consiglio chose not to have Lloyd testify because Consiglio "felt uneasy with him." (2EHT 15). Lloyd seemed to be "inviting [Consiglio] to give him testimony on what to say." (*Id.*). Consiglio included Lloyd on a list of potential witnesses that he disclosed to the prosecutor "in the unlikely event that [Consiglio] would have to use him." (*Id.*).

In addition, Consiglio contacted Bridgette Timcho, Petitioner's girlfriend. (2EHT 16; *see also* FAP, Exh. A). Although he thought that they probably talked about witnesses, Consiglio could not remember with certainty. (*Id.*). Consiglio also could not recall individuals identified in his notes as Steve, Scott Gibson, Mike and Dunlap. (2EHT 16–17; *see also* 2EH, Exh. 23 at 90, 99, 152). He believed William Hewitt "was a person that may have had the knife" but was unsure. (2EHT 17; *see also* 2EH, Exh. 23 at 155). Consiglio knew that "Bunker" (i.e., Hewitt) was an individual at the location of Petitioner's arrest, along with Christopher Lloyd (identified in his notes as "Chris"), Daniel Harrison (identified in his notes as "Danny Dog"), and an individual named "Tipper." (2EHT 18–19). He did not call any of these witnesses at trial.

Consiglio chose not to have Petitioner testify. (2 EHT 14). He made this decision because the trial court ruled to allow impeachment evidence of Petitioner's prior convictions and Consiglio "felt it was too risky to put him on the stand." (*Id.*).

At some point between Petitioner's conviction and sentencing, Petitioner contacted Consiglio about the McNutts. (2EHT 19). Consiglio considered contacting the McNutts and potentially using them in a motion for a new trial. (2EHT 20). However, Consiglio ultimately chose not to make a new trial motion because the presiding judge was, in Consiglio's opinion, "pro prosecution." (*Id.*). Consiglio based his opinion "on some of [the] things [the judge] had done in the trial." (*Id.*).

> He's a man I've known for a long time. I used to work in the same office with him. I felt that it would be not beneficial for [Petitioner] for me to make a motion for new trial. If I had to call the witnesses, I do not know if they would have had a—I was afraid to put them on in front of that judge. If he made a ruling detrimental to [Petitioner], it could screw up any chance he has on appeal, so I left it for someone in the future to take care of it.

(*Id.*).

On cross-examination, Consiglio testified that he "talked to people" even though he did not hire an investigator. (2EHT 22). He remembered speaking "a lot" with Christopher Lloyd, and also with Petitioner and Bridgette Timcho. (2EHT 22, 49–50). He acknowledged that there were phone numbers for other people in his notes, but thought that if he had talked to any of them there would be some notes regarding the conversations. (*Id.*). Consiglio did not contact Daniel Harrison because Consiglio "believe[d] he was in prison." (2EHT 51).

Because he knew that Petitioner had a criminal record and was facing a third strike, Consiglio "took the case pretty seriously." (2EHT 26–27). Shortly after he took over Petitioner's case, Consiglio filed a successful motion to dismiss the information. (2EHT 35; *see also* 2EH, Exh. 23 at 82–86). At trial, Consiglio made a decision to attempt to impeach the testifying officers rather than calling any defense witnesses. (2EHT 21).

Consiglio managed to find Christopher Lloyd and speak with him. (2EHT 32, 34). Lloyd told Consiglio that he did not see what had happened in the parking lot and could not confirm that Petitioner brought the copper bar to the parking lot. (2EHT 32, 41–42). Consiglio "didn't trust him" and "couldn't see putting him on [the stand]." (2EHT 32; *see also* 2EHT 39–40). However, Consiglio believed that Lloyd had attempted to contact Thomas Erwin for him. (2EHT 33).

Consiglio was aware that, prior to his involvement in the case, the public defender's office had developed a defense theory of mistaken identity. (2EHT 27–28). Both before and during trial, Petitioner was adamant that he had not thrown the knife. (2EHT 56–57). In a conversation with Consiglio, Petitioner tried to explain the mistaken identity theory, telling Consiglio that he had only thrown the copper bar, not the knife. (2EHT 45–46). The theory advanced by the public defender's office identified Thomas Erwin as the actual knife thrower, but Petitioner may have told Consiglio that someone else had thrown the knife, possibly William Hewitt. (2EHT 27–29).[13]

Petitioner wrote Consiglio a letter indicating that a second witness with the first name of Thomas was going to plead guilty to the crime. (2EHT 43–44). Although Consiglio could not locate Erwin, Consiglio "was told that [Erwin] did not want to come forward to testify." (2EHT 31). According to Consiglio, "I did not want a hostile witness if I was able to contact him, so I let it go." (*Id.*). Consiglio believed that Christopher Lloyd was the person who told him that Erwin did not wish to come forward. (2EHT 33). Consiglio stated that "maybe I shouldn't have listened to Mr. Lloyd." (2EHT 33).

### 2. Yasmin Cader's Expert Testimony

At the time of the Second Evidentiary Hearing, Yasmin Cader had been a deputy federal public defender in Los Angeles for four years. (2EHT 61). Previously, she served as a public defender in the District of Columbia for four years. (*Id.*). She also worked as a staff attorney in the federal public defender's office in the Southern District of New York for six years. (*Id.*). Prior to starting with the District of Columbia's public defender's office, Cader attended six weeks of training, including a specific session on conducting an investigation with and without an investigator. (2EHT 62). In addition, Cader has trained attorneys as a faculty member with the National Criminal Defense College in Macon, Georgia and with the San Diego Innocence Project training program. (2EHT 62–63). She has also worked with lawyers at the local public defender's offices in Milwaukee, Anchorage, Boston, and San Francisco. (2EHT 63).

---

**13.** Consiglio seemed extremely uncertain on this point. Initially, he thought Petitioner had identified a "Thomas" other than Thomas Erwin. (2EHT 28). He thought the person's last name started with an "H." (*Id.*). When asked if it could be Hewitt, Consiglio respond-ed, "Maybe it is." (2EHT 29–30). Consiglio admitted having no independent recollection of what Petitioner had told him. (2EHT 29). Instead, he based his testimony on something he thought he had read while reviewing his notes. (*See* 2EHT 29–30).

Cader estimated that she has represented clients in more than forty weapons possession cases. (2EHT 63–64). In a case where witnesses claim to have seen the defendant dropping a weapon, a typical defense is that the witnesses were mistaken about what they saw happen. (2EHT 65–66). In such a case, an important first step is the initial meeting with the client. (2EHT 66). This meeting gives the defense attorney a picture of the scene before seeing the government's discovery as well as potential percipient witnesses. (Id.). Afterwards, usually on the same day, a defense attorney will write an investigative memorandum outlining what she wants the investigator to do. (Id.). It is best for the investigator to get to the scene as quickly as possible to determine both the physical layout and any potential obstructions that may have impeded the witnesses' views. (2EHT 65–67). It would be improper for an attorney to rely on her client or his friends and family members to conduct an investigation because the client is an interested party and it might raise issues of bias or obstruction of justice. (2EHT 67). In addition, such persons are not trained to conduct an investigation. (Id.).

According to Cader, a defense attorney should not rely on her client to decide which witnesses should testify at trial, which is a question of strategy. (2EHT 67–68). In making this decision, credibility is the most important factor, particularly when the government's witnesses are law enforcement personnel. (2EHT 68). A witness's employment history, stability, and lack of criminal history make her more credible in the eyes of judges and jurors. (Id.). Law enforcement personnel and clergy are the most credible witnesses. (Id.).

In her career as a public defender, Cader has inherited cases from other attorneys. (2EHT 69). When this occurs, she "ha[s] to start from ground zero." (Id.). She must assess the need for additional investigation and "see[ ] if there [are] additional motions that need to be filed, witnesses that need to be interviewed, strategy that needs to be developed." (2EHT 69–70). When developing the investigation, Cader testified that it is vital to try to find every percipient witness. (2EHT 70–71). In Cader's experience, the standard for defense attorneys in terms of conducting investigations does not differ from jurisdiction to jurisdiction. (2EHT 71).

On cross-examination, Cader testified that it is possible to inherit a case from another attorney without needing to conduct further investigation and that it depends on when she gets the case. (2EHT 73–74). She cited a recent example where she had inherited a case after the plea agreement was negotiated and signed but before sentencing. (2EHT 74). In that case, "there's no new investigation factually for the charge that can be done." (Id.).

### 3. Natalie Adomian's Testimony And Declaration

Natalie Adomian, the prosecutor at Petitioner's trial, has been a deputy district attorney for Los Angeles County for eleven and a half years. (2EHT 81). The only witnesses that she identified were the police officers. (2EHT 81–82). On June 16, 1999, Consiglio told her that he planned to call Christopher Lloyd.[14]

14. Adomian "later learned that the true name of the witness was Christian Lloyd." (2EH, Exh. 107 ¶ 2). However, the Court refers to Lloyd as "Christopher" because (1) nearly all other references to Lloyd in the record use the first name Christopher; (2) there is no evidence that Lloyd's first name is Christian other than Adomian's uncorroborated statement; and (3) whether Lloyd's first name is Christian or Christopher is irrelevant to the merits of this case.

(2EHT 82; *see also* 2EH, Exh. 107 ¶ 2). Consiglio told her that "their defense was going to be that a guy named Hewitt was the one who tossed the weapon." (2EHT 82; *see also* 2EH, Exh. 107 ¶ 3). "After speaking with Consiglio about Lloyd and Hewitt, [Adomian] contacted gang unit detectives in various Los Angeles Police Department stations to try to acquire information about both men. (2EH, Exh. 107 ¶ 4).

Adomian learned that Lloyd was an associate or member of the Nazi Low Riders ("NLR") gang based on admissions by other NLR members who identified Lloyd as a fellow member, mail from Lloyd addressed to Hewitt that included a swastika and was signed "your brother with much love and respect," Lloyd's tattoos, and Lloyd's contacts with the police. (*Id.,* Exh. 107 ¶ 5). In addition, Adomian learned that while executing a 1999 search warrant at Lloyd's house, officers found narcotics, a handgun, and items stolen from Vans Shoes Outlet, which formed the basis for criminal charges against Lloyd. (*Id.*).

Adomian believed that Petitioner and others went to the Gold Apple Bar to beat up Daniel Harrison. (2EHT 83; *see also* 2EH, Exh. 107 ¶ 5). She learned that, following the incident, Petitioner stayed with Lloyd from June 6, 1998 to October 26, 1998. (2EH, Exh. 107 ¶ 6). After Petitioner had been taken into custody, he requested to meet with LAPD detectives and asked if they could "talk to the cops and have them change their story?" (2EH, Exh. 107 ¶ 7). When the detectives refused, Petitioner asked, "what if I had somebody come to court and say that the knife was his?" (*Id.*). Petitioner asked the detectives not to testify in court that he was lying. (*Id.*).

After obtaining this information about Petitioner, Lloyd, and Hewitt, Adomian shared the information with Consiglio pri-

or to the close of the prosecution's case-in-chief. (2EHT 83, 85–86; 2EH, Exh. 107 ¶ 8). Adomian informed Consiglio that she intended to use the information to impeach Petitioner, Lloyd, and Hewitt, if Consiglio called them as witnesses at trial. (2EH, Exh. 107 ¶ 8; *see also* 2EHT 82).

On cross-examination, Adomian testified that she considered her attempts to acquire information about Lloyd and Hewitt as "investigation." (2EHT 89–90). She spoke with one detective who told her that Lloyd had told him that both Lloyd and someone named Wayne Chapman worked for Consiglio. (2EHT 91). On that basis, Adomian concluded that Consiglio "knew a lot more about these people than he was letting on." (*Id.*).

## D. Defense Counsel's Disciplinary Record And Disbarment Proceedings

Michael Edward Consiglio, Petitioner's trial counsel, was admitted to practice law in California on June 29, 1973. (FAP, Exh. H at 86). On September 29, 1986 he was administratively suspended for failure to pay bar membership fees. (*Id.,* Exh. H at 80–81). His membership was reactivated on March 24, 1988. (*Id.*).

On December 1, 2000, the State Bar charged Consiglio with one count of failure to perform with competence, Cal. R. Prof'l Conduct 3–110(a), one count of failure to respond to client inquiries and to inform client of significant development, Cal. Bus. & Prof.Code § 6068(m), one count of improper withdrawal from employment, Cal. R. Prof'l Conduct 3–700(a)(2), one count of advising the violation of law, Cal. R. Prof'l Conduct 3–210, one count of failure to refund unearned fees, Cal. R. Prof'l Conduct 3–700(d)(2), and one count of failure to cooperate in State Bar investigation, Cal. Bus. & Prof.Code § 6068(i). (FAP, Exh. H at 129–33).

The charges alleged that Consiglio repeatedly advised a client with an outstanding warrant for her arrest to "lie low" in order to avoid apprehension by law enforcement and that he refused to return her phone calls or refund her $1,500 fee. (*Id.*, Exh. H at 129–30). On May 24, 2001, the State Bar Court dismissed the charges without prejudice. (*Id.*, Exh. H at 118).

On or about May 16, 2001, Consiglio entered into a stipulation with the State Bar that he failed to support the laws of California, Cal. Bus. & Prof.Code § 6068(a), by practicing law while not an active member of the State Bar, *id.* §§ 6125–6126. (FAP, Exh. H at 88, 112). Pursuant to the stipulation, the State Bar issued an Order effective June 9, 2001 imposing a private reprove on Consiglio with conditions that he (1) complete three hours of California Minimum Continuing Legal Education ("MCLE") approved courses in law office management, attorney-client relations, and/or general legal ethics; (2) submit evidence of his compliance within nine months; and (3) complete State Bar Ethics School within one year. (*Id.*, Exh. H at 112).

On July 18, 2001, a probation deputy wrote a letter to Consiglio reminding him of his MCLE and State Bar Ethics School deadlines of March 13, 2002 and June 13, 2002, respectively. (*Id.*, Exh. H at 112–13). On June 18, 2002, after Consiglio had failed to meet the deadlines, the probation deputy wrote a second letter, asking Consiglio to submit proof of compliance by July 3, 2002. (*Id.*, Exh. H at 113). Consiglio did not submit proof of compliance with the MCLE requirement until January 13, 2003. (*Id.*). He did not submit proof of compliance with the State Bar Ethics School requirement until November 14, 2002. (*Id.*).

Due to Consiglio's failure to comply with the conditions of his private reproval, in violation of rule 1–110 of the California Rules of Professional Conduct, the State Bar publicly reproved him with conditions effective April 16, 2003. (*Id.*, Exh. H at 88, 113). The conditions required that he (1) comply with the State Bar Act and Rules of Professional Conduct for a specified period; (2) submit written quarterly reports to the Probation Unit certifying his compliance; and (3) provide proof of passage of the Multistate Professional Responsibility Examination ("MPRE") by April 16, 2004. (*Id.*, Exh. H at 99–100).

On April 18, 2003, a probation deputy wrote a letter to Consiglio reminding him of the terms and conditions of the public reproval. (*Id.*, Exh. H at 100). The letter advised Consiglio that he must complete the MPRE requirement by April 16, 2004. (*Id.*). On January 12, 2004, a probation deputy sent another letter to Consiglio reminding him of the April 16, 2004 MPRE deadline and advising him that he must submit his next quarterly report by April 10, 2004 and a final report by April 16, 2004. (*Id.*). Consiglio failed to file the April 10, 2004 quarterly report, the final report and the proof of MPRE passage. (*Id.*, Exh. H at 101).

Consequently, on January 13, 2005, the California Supreme Court found Consiglio had again violated rule 1–110. (*Id.*, Exh. H at 93). The state supreme court ordered Consiglio suspended from the practice of law for one year, but stayed the suspension and placed him on probation for two years. (*Id.*, Exh. H at 93). In addition, the court ordered Consiglio to take and pass the MPRE within one year. (*Id.*, Exh. H at 93).

On August 11, 2006, the California Supreme Court issued an order actually suspending Consiglio from practicing law for one year for willfully violating the terms of his probation. (*Id.*, Exh. H at 88–89). The court found that he had committed multiple acts of misconduct and demon-

strated indifference towards rectification. (*Id.*, Exh. H at 89). Consiglio was ordered to notify his clients of his suspension within thirty days and to notify the State Bar Court of his compliance within forty days. (*Id.*, Exh. H at 86–87); Cal. R. Ct. 9.20 (former rule 955). He failed to do so. (FAP, Exh. H at 87).

Consequently, the State Bar initiated disciplinary proceedings. (*See id.*, Exh. H at 83). The State Bar served Consiglio with a notice of disciplinary charges on May 25, 2007, which was returned with a stamp noting that it had been unclaimed. (*Id.*, Exh. H at 84). Counsel for the State Bar attempted to contact Consiglio by various means, but Consiglio failed to respond. (*Id.*). The State Bar Court recommended disbarment and on May 4, 2008, Consiglio was disbarred. (*Id.*, Exh. H at 80, 90).

## IV.

### PETITIONER'S CLAIM

Petitioner claims that he "was denied his constitutional right to effective assistance of counsel" during trial when his counsel "failed to investigate and locate witnesses who would have testified that Petitioner did not have possession of the knife." (FAP at 5). Specifically, Petitioner asserts that his counsel "failed to conduct a proper pretrial investigation, thereby failing to locate or interview witnesses to the incident"; "failed to respond to Petitioner's request that a percipient witness, James McNutt, be called"; "failed to respond to a potential witness, Jorgi Owen, who informed [counsel] of her personal knowledge of the incident"; "failed to offer any witness testimony in Petitioner's defense"; "failed to offer evidence of third party culpability"; and "failed to make a motion for a new trial when Petitioner requested the motion and provided him with contact information for the witnesses

[counsel] had not discovered or interviewed." (*Id.*).

## V.

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected amendments to the federal habeas statutes, applies to the instant First Amended Petition because Petitioner filed it after AEDPA's effective date of April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under AEDPA, a federal court may grant habeas relief if a state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court has held that "[a] state-court decision is 'contrary to' our clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

If a state court decision is not "contrary to" clearly established precedent, habeas relief may still be granted if the state court decision is not only merely errone-

ous, but is " 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.' " *Packer*, 537 U.S. at 11, 123 S.Ct. 362.

■ Pursuant to Section 2254(d)'s "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [Supreme Court precedent] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (citations omitted). This standard requires more than a finding that the state court committed "clear error." *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Instead, the reviewing court must find that the application of federal law was "objectively unreasonable" in order to warrant habeas relief. *Id.* at 76, 123 S.Ct. 1166.

■ The only definitive source of "clearly established Federal law" under AEDPA is, collectively, "the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412, 120 S.Ct. 1495; *see also Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir.2000) (Ninth Circuit cases may nonetheless provide "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law" and help "determine what law is 'clearly established.' "). The Supreme Court has characterized the AEDPA standard of review as a "highly deferential standard for evaluating state-court rulings," *Lindh*, 521 U.S. at 333 n. 7, 117 S.Ct. 2059, and has opined that this standard "demands that

state-court decisions be given the benefit of the doubt." *Visciotti*, 537 U.S. at 24, 123 S.Ct. 357.

■ The California Supreme Court denied Petitioner's habeas petition without comment or citation to authority. (FAP, Exh. Q). In these circumstances, a district court "looks through" the unexplained decision to the last reasoned decision as the basis for the state court's judgment. *Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir.) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)), *cert. denied*, —— U.S. ——, 130 S.Ct. 509, 175 L.Ed.2d 362 (2009). The California Court of Appeal denied Petitioner's habeas petition without discussion, citing *In re Resendiz*, 25 Cal.4th 230, 239, 105 Cal.Rptr.2d 431, 19 P.3d 1171 (2001), *In re Harris*, 5 Cal.4th 813, 833, 21 Cal. Rptr.2d 373, 855 P.2d 391 (1993), *In re Jackson*, 3 Cal.4th 578, 586 n. 2, 11 Cal. Rptr.2d 531, 835 P.2d 371 (1992), *disapproved on other grounds, In re Sassounian*, 9 Cal.4th 535, 545 n. 6, 37 Cal.Rptr.2d 446, 887 P.2d 527 (1995), and *People v. Williams*, 44 Cal.3d 883, 936–37, 245 Cal. Rptr. 336, 751 P.2d 395 (1988). (FAP, Exh. M). These citations merely set forth the standard governing ineffective assistance claims under state and federal law. Accordingly, the last reasoned decision is the Los Angeles County Superior Court's May 19, 2005 order denying Petitioner's habeas petition. (FAP, Exh. N).

## VI.

## DISCUSSION

### A. *The Standard For Ineffective Assistance Of Counsel*

In order to prevail on an ineffective assistance of counsel claim, a convicted defendant must prove that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under AEDPA, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance,* —— U.S. ——, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* (characterizing the "judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard" as "doubly deferential").

Proof of deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Because "the proper standard for attorney performance is that of reasonably effective assistance" under "prevailing professional norms," a criminal defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. In conducting the reasonableness inquiry, a court must consider all the circumstances. *Id.* The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90, 104 S.Ct. 2052.

Proof of prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."

*Id.* at 693, 104 S.Ct. 2052. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052.

■ On habeas review, a court "assess[es] the prejudicial impact of most constitutional errors by asking whether they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Musladin v. Lamarque,* 555 F.3d 830, 834 (9th Cir.2009) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). However, "where a habeas petition governed by AEDPA alleges ineffective assistance of counsel ..., [courts] apply *Strickland's* prejudice standard and do not engage in a separate analysis applying the *Brecht* standard." *Id.* Finally, because this case is governed by AEDPA, this Court must decide whether the state court's decision resulted in an unreasonable application of clearly established Supreme Court law. *Richter v. Hickman,* 578 F.3d 944, 951 (9th Cir.2009).

**B. *The May 19, 2005 Superior Court Decision***

■ In a brief order, the superior court denied Petitioner's claim of ineffective assistance of counsel:

> [Petitioner's] petition for writ of habeas corpus is read and considered. Insufficient evidence alleged that trial counsel failed to act in a manner of a reasonably competent attorney based on facts known or should have been known to counsel. Counsel's disciplinary record

with the state bar considered but not controlling. The petition is denied. (FAP, Exh. N). Because the superior court did not address the prejudice prong, it appears that the court denied Petitioner's claim on the basis that Petitioner failed to demonstrate deficient performance.[15] *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

This Court also focuses on the deficient performance prong, albeit for a different reason. Having previously concluded that Petitioner passes through the *Schlup* gateway, the Court finds that Petitioner necessarily satisfies the *Strickland* test for prejudice, as discussed below. With respect to the deficient performance prong, the Court concludes that Petitioner's trial counsel rendered ineffective assistance and that the California courts incorrectly and unreasonably applied clearly established federal law in reaching a contrary result.

**C. *The Court's Prior Determination That Petitioner Satisfied The Schlup Actual Innocence Standard Also Establishes The Prejudice Prong Of The Strickland Analysis***

In order to pass through *Schlup's* actual innocence gateway, a petitioner must show "that it is more likely than not that no reasonable juror would

have convicted him in the light of the new evidence." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851. "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327 & n. 45, 115 S.Ct. 851 (citing the *Strickland* prejudice standard). Put differently, demonstrating prejudice under *Strickland* requires a lesser showing than that required to pass through the *Schlup* actual innocence gateway. As this Court has already found that Petitioner meets the more stringent *Schlup* test, it necessarily follows that he also satisfies the prejudice test under *Strickland. See also Murden v. Artuz,* 497 F.3d 178, 194 (2nd Cir.2007) (explaining that actual innocence under *Schlup* "requires 'a stronger showing' than the showing of prejudice necessary to prevail on an ineffective assistance claim"); *Fisher v. Gibson,* 282 F.3d 1283, 1310 (10th Cir.2002) (declining to "limit ineffective assistance to only those claims where defendant can demonstrate his innocence"); *United States ex rel. Bell v. Pierson,* 267 F.3d 544, 552 (7th Cir.2001) ("[T]he standard for finding a fundamental miscarriage of justice assures that the petitioner's case must be 'extraordinary,' and requires 'a stronger showing than that needed to establish prejudice' under *Strickland.*"); *Carriger v. Stewart,* 132 F.3d 463, 486 n. 7 (9th Cir.1997) (en banc) (Kozinski, J., dissenting) ("The majority seems to adopt the *Strickland* prejudice standard rather than *Schlup/Carrier*[16] for Ninth Circuit actual innocence claims.... The *Schlup* standard is higher, and requires the petitioner to

---

**15.** Because the superior court did not reach the prejudice prong of the *Strickland* analysis, AEDPA deference does not apply to this Court's analysis. *See Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the

state courts below reached this prong of the *Strickland* analysis."). Even if this Court applied AEDPA deference to the prejudice analysis, however, the state court decisions were objectively unreasonable.

**16.** *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

prove that he is actually innocent." (citations omitted)).

■ To the extent it is possible for a petitioner to make the *Schlup* actual innocence showing but nonetheless fail to demonstrate prejudice under *Strickland,* such a possibility does not exist on the present facts. Petitioner argues that his trial counsel performed deficiently in part by failing to conduct an investigation that would have led to the discovery and presentation to the jury of crucial witnesses. To establish prejudice, then, Petitioner must show a reasonable probability that, had these witnesses been located and called to testify, the outcome of his trial would have been different.[17] As the Court previously concluded, "had the jury been able to consider this ... evidence, no reasonable juror would have found Petitioner guilty beyond a reasonable doubt." (July 13, 2009 Report and Recommendation at 42 (internal quotation marks and brackets omitted)). Consequently, Petitioner has already demonstrated prejudice under the *Strickland* standard.

Respondent argues that it is "entirely speculative" that an interview with Harrison would have identified the McNutts to Petitioner's counsel. (R.'s PEH Br. at 14). As previously discussed, this issue is not properly part of the prejudice inquiry. Nonetheless, the Court disagrees with Respondent that interviewing Harrison would not have led to Petitioner's counsel to the McNutts. As discussed below, a reasonable defense attorney would have attempted to identify and interview as many percipient witnesses as possible, including Harrison. In interviewing Harrison, Petitioner's counsel should have found out the other people Harrison knew to be at the scene of the incident. Harrison was meeting the McNutts at the Gold Apple. (1EHT 18, 47). Mrs. McNutt spoke with her son about the incident either later that evening or the next day. (1EHT 60–62). Had Petitioner's counsel interviewed Harrison, counsel would have learned that the McNutts were present and should have attempted to interview them.

Respondent also argues that even if Petitioner's counsel had discovered the McNutts through Harrison, Petitioner fails to show that his counsel would have called them as witnesses.[18] (R.'s PEH Br. at 15). Respondent asserts that "their testimony would have lacked credibility and would have harmed Petitioner's case" due to "discrepancies that could not merely be discounted as minor." (*Id.*). Respondent's argument is not well taken, as the Court

17. Respondent frames the prejudice inquiry differently and, in the Court's view, incorrectly. Respondent would have the Court conduct a "twofold" prejudice inquiry:

The first component of the question is if Consiglio had performed differently, would he have discovered the new witnesses who would have allegedly presented the new evidence. The second component is if Consiglio had discovered the new witnesses, would he have called them to testify at trial. (R.'s PEH Br. at 13).

However, Respondent's proposed prejudice inquiry more accurately fits into *Strickland's* deficient performance prong. *See, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1112 (9th Cir.2006) (considering counsel's failure both to investigate exculpatory information and to

introduce it into evidence under the deficient performance prong). Here, the deficient performance alleged is not counsel's failure to perform *any* investigation, but instead counsel's failure to perform an investigation of all percipient witnesses. (*See* FAP at 5 (alleging that "[d]efense counsel's representation fell below the standard of reasonably effective representation when Consiglio ... failed to conduct a proper pretrial investigation, thereby failing to locate or interview witnesses to the incident.")). Thus, the appropriate question is not *would* Consiglio have discovered the witnesses, but rather *should* he have discovered them.

18. Again, this issue is related more to deficient performance than to prejudice.

previously found otherwise. (*See* July 13, 2009 Report and Recommendation at 34 ("This Court finds that the McNutts were credible and persuasive witnesses."); *id.* at 41–42 ("In statements made informally, under oath in a declaration, and under oath in live testimony before the Court, the McNutts have maintained a consistent version of events.")).

Regardless, the "discrepancies" cited by Respondent were in fact minor or even non-existent and are irrelevant to the exculpatory nature of the McNutts' testimony. For instance, Respondent points out that the McNutts both testified arriving at the Gold Apple around sunset when "the incident that occurred in the parking lot occurred around 1 a.m." (R.'s PEH Br. at 15). However, Mr. McNutt acknowledged that his testimony as to the time was only an "estimate" and expressly cautioned that he was "not positive of the time." (1EHT 18; *see also* 1EHT 30 ("I'm not sure of the exact time.")). Clearly, Mr. McNutt's estimate of 7:30 p.m. was early given that he also testified that he and his wife arrived when "[i]t was dusk" (1EHT 33), and the sun did not set that evening until more than a half hour later.[19] Mrs. McNutt did not know what time they arrived, only that "[i]t was dark" (1EHT 48), and estimated that it was approximately 8:00 p.m. because "[i]t was edge of dark" in June. (1EHT 59). Given that the event in question occurred nearly eleven years before

the hearing, it is unremarkable that the McNutts would not remember the exact time of night when they arrived at the bar.[20] It is also not a fact that was at issue in the trial.

Respondent also notes that the McNutts "testified inconsistently with each other" because "Mrs. McNutt testified that she and her husband entered the bar after the police left and had drinks" whereas Mr. McNutt "never mentioned entering the bar or having drinks." (R.'s PEH Br. at 16). However, Mrs. McNutt expressed a high degree of uncertainty about whether they later went into the bar. (*See* 1EHT 60 ("I'm thinking we had one or two [drinks]. Yeah, I think so. I can't be positive that far, long ago.")). Regardless, whether the McNutts calmed down by having a drink or two or left immediately after the police detained them is also irrelevant to their earlier observations supporting Petitioner's innocence.

Respondent also notes Mrs. McNutt's testimony "that Petitioner remained in a vehicle as Hewitt threw the item" as inconsistent with the fact that "Mr. McNutt . . . never mentioned Petitioner's remaining in a vehicle." (R.'s PEH Br. at 16 (citing 1EHT 63)). However, the fact that Mr. McNutt never contradicted Mrs. McNutt on this point is not a discrepancy. Moreover, it appears that counsel for Petitioner simply misspoke and that Mrs. McNutt

**19.** The Court takes judicial notice that on June 6, 1998 in Los Angeles the sunset occurred at 8:03 p.m. *See* U.S. Naval Observatory, Astronomical Applications Department, Sun and Moon Data for One Day, http://www.usno.navy.mil/USNO/astronomical-applications/dataservices/rs-one-day-us (enter date: "June 6, 1998"; city: "Los Angeles"; and state: "California").

**20.** McCracken's testimony as to the time was consistent with that of the McNutts. He testified that he arrived at the Gold Apple around dusk on June 6, had one or two beers, and did

not leave until about 9:30 p.m., approximately one hour after dusk. (1EHT 97). Given the discrepancies in the police officers' testimony at the preliminary hearing discussed above, it is entirely plausible that the officers were mistaken that the arrest occurred at 1:00 a.m. on June 6 and that the McNutts and McCracken were correct. For example, Officer Townsend testified that the events at issue happened "in the evening." (1 RT 46). To the extent the officers were mistaken about the time, the failure to call the McNutts and McCracken further prejudiced Petitioner.

misunderstood counsel to refer to Daniel Harrison, her son, rather than Daniel Larsen, since Daniel Harrison was initially in a car but later disappeared. (*See* 1EHT 19, 50 (stating that Daniel Harrison was sitting in a car). *Compare* 1EHT 60 ("My son disappeared.... He was just gone.") *with* 1EHT 63 ("[H]e was there, and he was gone.")).

In addition, Respondent claims that "[t]he McNutts' testimony also conflicted with Petitioner's proffer at trial." (R's PEH Br. at 16). At trial, after the prosecution finished its case-in-chief, the court held a hearing on whether, if Petitioner chose to testify, the prosecution could impeach him with his prior convictions. (*See* 2 RT 249–55). The trial court invited Petitioner's counsel to make an offer of proof as to what testimony Petitioner would provide if Petitioner were to take the stand. (2 RT 252). Petitioner's counsel stated that Petitioner would testify that Petitioner took the copper item out of his pocket and discarded it at the time he saw the officers. (*Id.*). At the First Evidentiary Hearing, Mr. McNutt testified that Petitioner's "hands were at the side the whole time, and he was just standing there, listening" until the police arrived, at which point "he just went ahead, turned around, walked normal, went ahead." (1EHT 24). Mrs. McNutt testified that Petitioner "just stood there," not moving, and that it would surprise her very much to hear that Petitioner planned on testifying that he threw something. (1EHT 65). Respondent contends that Petitioner's offer of proof at trial "is admissible against Petitioner in these proceedings," citing *United States v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981) and Federal Rule of Evidence 801(d)(2)(C). (R.'s PEH Br. at 17).

Whatever evidentiary value Petitioner's offer of proof might have here—and the Court notes that it was a statement nei-ther made by Petitioner himself nor subject to questioning under oath—it is unreasonable to assume that Petitioner's counsel would have made such an offer of proof knowing that the McNutts planned to offer testimony that apparently conflicted with it. This argument simply does not bear on the issue of prejudice from the failure to call the McNutts. Instead, it attempts to impeach Petitioner's credibility, which is not at issue.

The fact that the McNutts' testimony may have contained minor inconsistencies about an event that occurred nearly eleven years earlier is neither surprising nor indicative that their testimony would have contained any inconsistencies at Petitioner's trial. Moreover, minor inconsistencies would not have made their testimony less likely to be credited by the jury. Indeed, the jury knew that the two officers who testified against Petitioner provided inconsistent testimony at the preliminary hearing, but it credited the officers' trial testimony anyway.

Respondent also contests the prejudicial value of failing to call Brian McCracken. (R.'s PEH Br. at 18). Although the jury may have viewed his testimony with more skepticism than that of the McNutts given McCracken's criminal record and previous acquaintance with Petitioner, McCracken provided credible testimony at the First Evidentiary Hearing that the person holding the knife was someone other than Petitioner. Respondent asserts that McCracken's description of the person with the knife differed from Mrs. McNutt's description of Hewitt. (R.'s PEH Br. at 18). However, McCracken testified at the evidentiary hearing that it had been a long time and was not sure about his description of the man with the knife. (1EHT 92–93). Moreover, McCracken's failure to testify, while tending to establish prejudice, is peripheral to Petitioner's claim.

Finally, Respondent contends that "Petitioner had no basis for a new trial motion." (R.'s PEH Br. at 18 (citing Cal.Penal Code § 1181(8))). California permits a trial court to grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." Cal.Penal Code § 1181(8). Respondent argues that Petitioner would not have been entitled to a new trial because "[n]ot a single witness Petitioner mentions in his [First Amended Petition] was unknown to him during trial." (R.'s PEH Br. at 19). To the contrary, however, Petitioner states in his declaration that he "discovered the names of James and Elinore McNutt ... after [his] conviction but before [he] was sentenced." (FAP, Exh. E ¶ 2).

The Court finds Petitioner's statement credible, given his obvious incentive to alert his counsel about the McNutts at the earliest possible time. The McNutt testimony was clearly material. Thus, the only reason Petitioner would not have been entitled to a new trial is if the court concluded that the McNutts could have been located prior to trial with reasonable diligence. As discussed below, the Court finds counsel should have located the McNutts. However, to the extent counsel's lack of diligence would have rendered a new trial motion futile, thereby undermining the prejudice from counsel's failure to make the motion, Petitioner's argument for prejudice based on counsel's failure to investigate is strengthened.

In sum, Respondent's arguments are not persuasive. The failure of Petitioner's counsel to locate these extraordinarily exculpatory witnesses, and counsel's later failure to make a new trial motion once Petitioner brought the witnesses to his attention, prejudiced Petitioner.

### D. *Petitioner Has Shown By Clear And Convincing Evidence That His Trial Counsel Performed Deficiently*

Petitioner's arguments with respect to the deficient performance prong can be summarized as follows. First, trial counsel failed to conduct an adequate investigation, i.e., one that would have uncovered exculpatory witnesses, and failed to call those witnesses at trial. Second, given that failure, counsel neglected to investigate exculpatory witnesses discovered by Petitioner prior to sentencing and move for a new trial on that basis. For the reasons discussed below, the Court agrees with Petitioner.

### 1. Petitioner's Trial Counsel Performed Deficiently By Failing To Investigate And Locate Exculpatory Witnesses

▮▮▮ Criminal defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. " 'A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance.' " *Reynoso*, 462 F.3d at 1112 (quoting *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir.1999)). In particular, counsel has an obligation to investigate possible methods of impeachment and the failure to do so may in itself constitute ineffective assistance of counsel. *Id.*; *see also Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir.2008) ("This court has repeatedly held that a lawyer who fails adequately to investigate and introduce [evidence] that demonstrate[s] his client's factual innocence, or raise[s] sufficient doubt as to that question to undermine

confidence in the verdict, renders deficient performance.") (internal quotations and citations omitted).

In evaluating whether counsel's assistance was reasonable, "[p]revailing norms of practice as reflected in American Bar Association standards and the like" may serve as "guides to determining what is reasonable." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *see also Bobby v. Van Hook,* —— U.S. ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (per curiam) (noting that "[r]estatements of professional standards ... can be useful as 'guides' to what reasonableness entails" so long as "they describe the professional norms prevailing when the representation took place").

The American Bar Association ("ABA") standards in force at the time of Petitioner's case similarly reflect the importance of investigation. *See* American Bar Association, *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* 4–4.1 (3d ed. 1993) [hereinafter *ABA Standards]* ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case....").

> Considerable ingenuity may be required to locate persons who observed the criminal act charged or who have information concerning it. After they are located, their cooperation must be secured. It may be necessary to approach a witness several times to raise new questions stemming from facts learned from others. The resources of scientific laboratories may be required to evaluate certain types of evidence.... Neglect of any of these steps may preclude the presentation of an effective defense.
>
> The prosecutor and law enforcement agencies are important sources of information often needed by the defense lawyer. Apart from any formal processes of discovery that are available, prosecutors and law enforcement officers may have in their possession facts that defense counsel must know.
>
> . . . .
>
> Effective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial.... Failure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel.

*Id.,* Commentary, pp. 182–83.

 Here, there is no question that Petitioner's counsel conducted a limited and ineffectual investigation of percipient witnesses and failed to gain important information from the prosecutor. Consiglio contacted only two persons: Christopher Lloyd and Bridgette Timcho. Lloyd did not see the events and the record contains no evidence that Timcho was even at the Gold Apple that evening.

From the officer's report, Consiglio was aware of the existence of at least two witnesses that were with Petitioner at the time of the incident. (2EHT 24). Consiglio believed one of these individuals to be Lloyd (*id.*), but failed to identify or speak with the other witness, who was probably Mr. McNutt. Consiglio acknowledged that he would have a record in his notes if he had spoken with a person, yet his notes contain no such records. His notes do contain the names and phone numbers of additional persons, such as "Steve," "Scott Gibson," and "Dunlap," yet there is no indication that he ever contacted these individuals nor did he remember doing so.

Crucially, Consiglio never attempted to contact known eyewitnesses Hewitt, Tip-

per, or Harrison. Harrison, as the person who would have directly led to the McNutts, if not provided exculpatory testimony himself, and Hewitt, the person whom the McNutts' testimony suggests actually threw the knife, were two critical witnesses. Consiglio did not contact Daniel Harrison because he thought Harrison was in prison. (2EHT 51). This proffered rationale for not contacting a witness in a criminal proceeding is absurd. Witnesses in criminal proceedings are often incarcerated themselves. Moreover, prisoners are generally not difficult to locate. When they are transferred, there is a record of where they have been moved. To the extent Consiglio meant that he felt Harrison would be an undesirable defense witness, that still does not excuse Consiglio's failure to interview him. Counsel's failure to investigate these eyewitnesses constituted deficient performance.

Consiglio's judgment is further thrown into doubt by his reliance on Lloyd to find Thomas Erwin. Initially, Consiglio had reason to believe that Erwin was the knife thrower and, thus, an extremely important person to investigate. Consiglio described Lloyd as a "loose can[n]on" (2EHT 32), and Consiglio believed Lloyd may have been working for the police (2EHT 40). Yet Consiglio relied on Lloyd to locate and communicate with Erwin. This behavior raises serious doubts about Consiglio's professional judgment. At the evidentiary hearing, even Consiglio seemed to acknowledge as much. (*See* 2EHT 33 ("[M]aybe I shouldn't have listened to Mr. Lloyd.")).

In addition to his failure to investigate witnesses identified by the police report,

Petitioner, Lloyd, and Timcho, Consiglio failed to obtain crucial information about witnesses from the prosecutor. Consiglio did not recall any conversations with Adomian. (2EHT 36). Although she did speak with Consiglio, this did not occur until June 16, 1999, the eve of the trial, when Consiglio informed her about the possibility that he would call Hewitt and Lloyd as witnesses. (2EHT 82). The prosecutor did not disclose information to Consiglio until sometime "prior to the close of the People's case-in-chief." (2EH, Exh. 107 ¶ 8). Even then, the information pertained primarily to facts that the prosecutor had obtained about Hewitt, Lloyd, and Petitioner that she planned to use to impeach them. Had Consiglio spoken with Adomian earlier, however, he would have learned the prosecution's theory that Petitioner went to the bar to fight with Daniel Harrison. (*See* 2EHT 83). This information was crucial as it would have identified an additional witness and led to the McNutts. Consiglio's failure to speak with the prosecutor also constituted deficient performance.

▄▄▄ The Court's conclusion that Petitioner's counsel failed to investigate is bolstered by Consiglio's record of indifference to his professional responsibilities, which ultimately resulted in Consiglio's disbarment. *See Sanders v. Ratelle,* 21 F.3d 1446, 1460 (9th Cir.1994) (holding that attorney's "general incompetence and indifference to the interests of his clients, evidenced by his subsequent disbarment for a similar 'course of conduct,' " helped explain the attorney's failure to investigate).[21]

Although, as Respondent notes, Consiglio made some "sound tactical decision[s]"

---

21. Respondent asserts that consideration of Consiglio's disciplinary record with the State Bar is improper, citing *Bonin v. Calderon,* 59 F.3d 815, 828–29 (9th Cir.1995). (Answer at

10). However, *Bonin* merely acknowledged that such evidence *"may ... be properly excluded by the district court"* where such evidence "ha[s] little, if any, probative value."

(R.'s PEH Br. at 7), such as the decision not to have Lloyd testify on Petitioner's behalf when he was clearly not a credible witness, these decisions simply do not compensate for Consiglio's unreasonable failure to investigate.

### 2. Petitioner's Trial Counsel Performed Deficiently By Failing To Investigate Exculpatory Witnesses Identified By Petitioner Prior To Sentencing And Making A New Trial Motion

 Even if, *arguendo*, Consiglio's failure to conduct a pretrial investigation did not constitute deficient performance, his posttrial failure to investigate the McNutts and move for a new trial fell below a reasonable standard of performance. "Defense counsel's responsibility includes presenting appropriate posttrial motions to protect the defendant's rights." *ABA Standards, supra,* at 4–7.9; *see United States v. Hilliard,* 392 F.3d 981, 986 (8th Cir.2004) (opining that counsel's failure to timely file a new trial motion without good reason "is a classic dereliction of an attorney's obligation to provide his client with the type of performance required by the Sixth Amendment").

Here, Petitioner notified his attorney about the McNutts prior to sentencing. He informed his counsel that William Hewitt was the person with the knife and that both Harrison and his mother, Mrs. McNutt, were in the parking lot and "saw everything." (2EH, Exh. 23 at 88). Petitioner noted that Mrs. McNutt lived in Thousand Oaks. (*Id.*). Yet Consiglio did not investigate this information. Consiglio's only reason for not making a new trial motion on the basis of this new evidence was that the judge was "pro prosecution" and it "would be not beneficial for [Petitioner]" because "it could screw up any chance he has on appeal." (2EHT 20). Thus, Consiglio "left it for someone in the future to take care of it." (*Id.*).

Consiglio's stated reason is nonsensical. In ruling on a new trial motion, the superior court judge would either grant or deny the motion. If he granted the motion, Petitioner would very likely today be a free man. Even if the judge denied a new trial motion, Petitioner would at least have preserved the issue for direct appeal. Thus, this Court cannot imagine how making a new trial motion, even to a judge counsel believed was likely to deny it, would "screw up" Petitioner's chances on appeal. Consiglio's decision not to make a motion for a new trial based on the McNutts potential testimony was unreasonable and constituted deficient performance.

### E. *Conclusion*

"The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland,* 466 U.S. at 691–92, 104 S.Ct. 2052. After considering all of the evidence in the record, including that presented in the evidentiary hearings, this Court is convinced that reliance on Peti-

---

*Id.* (emphasis added). Here, it has some probative value, as one factor to consider among many. Although an attorney's disbarment will not result in a per se finding of ineffective assistance, an attorney's suspension or disbarment may reflect on his effectiveness. *See*

*United States v. Ross,* 338 F.3d 1054, 1056 (9th Cir.2003) (recognizing rule that a disbarred lawyer is not *per se* ineffective, but also noting that "[i]t is true that counsel's disbarment or suspension may raise doubts about his competence.").

**1232**

tioner's conviction is unfounded because Petitioner clearly received ineffective assistance of counsel. Petitioner's counsel performed deficiently by failing to conduct an adequate investigation, which would have identified extremely credible, exculpatory eyewitnesses, and by failing to make a motion for new trial when Petitioner brought these witnesses to his counsel's attention. These errors severely prejudiced Petitioner's defense because, had the jury heard this exculpatory testimony, no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. Consequently, Petitioner's conviction violated the Sixth Amendment. The California courts' determination was objectively unreasonable and contrary to clearly established federal law. Petitioner is therefore entitled to habeas relief.

## VII.

### RECOMMENDATION

IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; (2) granting the First Amended Petition; and (3) requiring Respondent to either release Petitioner or retry him within ninety days of the date that the Order adopting this Report and Recommendation and Judgment are entered.